Good morning. Verna Liefeld on behalf of Dr. Mark Roberts. Your Honor, I'd like to start out by addressing the or responding to the two cases that the government submitted to this court last week in a Rule 28 letter. And the first case is the Grotemeyer v. Hickman, which is regarding the jury misconduct issue, the extrinsic evidence relying on one's past personal experiences. And the Grotemeyer case, I believe, supports Dr. Roberts' position, and that was the case with the bizarre facts about the defendant who was nailing his door to the wall and nailing his door shut. And the jury foreman was a doctor and sitting down, and the guy was crazy, and that's why he did this. And obviously, anybody can tell that a guy who's nailing his door shut is probably crazy. And the court says that this is not to say that all juror experience is proper grist for the deliberative mill. And the case that we always go back to relying on is Navarro-Garcia, and that court certainly, we all rely on our personal experiences when we even want to come into oral argument. But Navarro-Garcia said that it is also can be misconduct if the jurors, well, the jurors' past personal experiences are important only for interpreting the evidence that's been produced in court. And in this particular case, this juror brought into the deliberations the fact that he said that he had been in Illinois, and he knew that there were no way stations, and that was relevant to the issue that was. Well, when the juror weighed in on that, what difference did it make? Because the evidence was simply overwhelming that these cows came, I mean, the pigs came from Illinois, and indeed, that was Roberts. Roberts didn't dispute that. Well, I mean, that the pigs actually came from Illinois. He disputed that he didn't see pigs in Tennessee, and that's what he certified. But the pigs came from Illinois. But the issue was not whether this load of pigs came from Illinois, but whether or not the health certificates had been signed purposely for this Mr. Smunderman to use to bring the pigs from. So the issue was, how did the pigs leave Illinois with a Tennessee health certificate? Well, would they have checked that at a way station? Is that your point, that the certificates would have been checked at a way station if they'd gone through a way station? Well, the issue was, the interesting twist in all of this is that the jurors said that there weren't any way stations, and that's how this could happen. But the government contended that the jurors' supposed past experience wasn't even true. So, you know, let me get into, the issue is, it wasn't a past experience. It was just something, you know, we don't even know is true. And cross-examination on this point would have assisted the trier effect. Because the issue is not where the pigs came from, but where did these health certificates come from, and whether or not the truck driver was telling the truth. Yeah, but why did that have anything to do with way stations? I'm still not clear about that. What difference did it make whether you had way stations or not? Well, I suppose because the documentation would have to be submitted to the way station. Why? Well, again, the government, the whole story wasn't laid out in the government's case. But again, I point out that not all past experiences are relevant for, you know, it's not anything goes. Yeah, but it just has to, it has to make some difference. I mean, I just don't get why it would have the slightest, whether it's personal experience or not, whether it was right, wrong, or indifferent. What difference does it make? Again, Your Honor, I think it's the issue of the, how did the health certificates go with this particular load of pigs? That's the issue. Okay. But in any event, I would also like to address the other case that the government submitted, which is United States versus Cordova Barajas, in which the government, where the case points out that, you know, once the defendant testifies, the jury obviously is free to disbelieve the defendant's testimony and therefore can defeat the sufficiency of evidence argument. But in this, that, of course, there's nothing new about that rule of law, but in this particular case, viewing the evidence in the light most favorable to the government, even if the jury disbelieved Dr. Roberts' testimony that he actually inspected these pigs, the government still put on no evidence connecting the failure to inspect the pigs and or perhaps giving a blank health certificate to Mr. Smotherman with an intent to defraud. There was no evidence presented that Dr. Roberts was aware that Mr. Smotherman had this scheme to defraud, much less participated in it. Now, I acknowledge that this Court has to view this sufficiency of evidence argument under the plain error standard because the trial counsel failed to review the Rule 29 motion, but I simply point out that we still have the gaping problem with the failure to present any evidence at all of Mr. Dr. Roberts' awareness of Smotherman's actual scheme. And the government never contended that Dr. Roberts received anything more than $20 per health certificate, so that's a big problem. I would move on to the issue regarding the Court's invitation to the jury at the outset of the case over the defendant's objection to submit questions to the witnesses and to the Court, and this is a highly controversial area of the law. It seems to be more and more common these days, but the law ranges from the gamut of there are several state courts, four courts, and in particular the Minnesota State Court, which have come out flat against this and saying there will be no questioning of witnesses or requests for evidence by jurors in a criminal case because this is not compatible with an adversarial system of justice. And then we go over to, you know, the courts that make it a matter of discretion and the issue of having to prove prejudice. This was a rather strictly limited type of jury participation, wasn't it? They had to submit the questions in writing. Well, it was not a general inquisition like a Chinese people's court with everybody pitching in and asking questions. No, it was not. But the issue is when you start out right from the beginning and invite the jurors to submit questions, even if they were in writing, even if you tell them that you might not answer all the questions, when you start out doing that, put the jurors in a completely different frame of mind than our adversarial system of justice contemplates, because the jurors then start thinking, well, how am I going to solve this case? The juror's job is to view the evidence and to determine whether the government has proved its case beyond a reasonable doubt. And in this particular case, the jurors start out right thinking, you know, okay, well, what's going on here? Because there are holes in both sides of the case. I acknowledge that.  And then when the truck driver, Mr. Neighborhouse, testified that contrary to the statements that he gave to the investigating officers before trial, so no one could have anticipated that this would have been an issue, he got on the witness stand and he said that Mr. Smotherman had a book from which he ripped out the health certificate and that he filled out certain portions of the health certificate. Therefore, the juror – I mean, the question is an intelligent question, but that's not what jurors are supposed to be doing, is trying to figure out, well, what, you know, we would like some evidence on this fact here. And that's helpful to your client. I don't understand why you would be complaining about it. Because, Your Honor, at the closing argument, okay, at the closing argument, the defense has to come out and point out, well, there was no – the government didn't put on any evidence that this was an issue. Well, sure, because it's the government's burden. So if the jury is wondering about it, to me, that's helpful to your client. I just don't see how it could possibly be prejudicial. It's not, because then the government comes back and says – implying that it was Smotherman's handwriting, because he said the defendant didn't put on any evidence of the assistance that he took with him to go through the field to inspect the pigs. And it becomes, in a sense, ordinarily I would say, yes, it is helpful to Mr. – to Dr. Roberts. But here the defendant is the one that had to, in closing argument, make a big deal out of this. And that's the whole point. Then it becomes the jury is no longer thinking about it in terms of did the government prove its case and then look to the defendant to point out that the government didn't prove its case. The jury wants to know what the truth is, wants to know what the facts are. And therefore, it is ignoring their proper role. And I think which also gives rise to the then, you know, making a determination based upon evidence or past experiences in which there was no record evidence on that fact. If we adopted your position, could we write an opinion that wouldn't create a per se rule, making any effort by the jury to ask questions a reversible error? It would be a startling case. It would have to be published and it would be page one news in all the lawyers' magazines. You could join the esteemed Minnesota Supreme Court in that regard. But I think we have to look at the distinctions of questions. For example, okay, the question – the first question that was asked, you know, is exhibit number 50 and 51, are they the same exhibits? I mean, there's nothing wrong with that question. I mean, we all have questions. Well, the point is there's something wrong with the jury asking questions. No. The only thing that matters is if there's something that is prejudicial about the process. And I just don't know. I'm not saying that a juror should never be allowed to ask a question and or that a juror – that a question should not even be answered. That's not what I'm saying. But in here – I mean, even this – the issue comes down to when you invite jurors to ask questions in order to probe the evidence and to try to help the parties solve the case, solve the crime, that's where you get into trouble. And in the – the pattern jury instructions and the warnings from this Court specifically state that in a criminal case, it's very, very dangerous, and that the court should not invite or solicit questions. And that is what happened here. Well, the Court just allowed questions. I mean, the Court didn't say, come on, you all, just, you know, hop right in. The Court said, you know, yeah, I'm not encouraging, I'm not doing anything. If you want to ask questions, present them in writing. I mean, that's as neutral as it gets. Well, when the Court starts out at the very beginning stating, I'm going to allow you to ask questions. Yeah. I mean, if you're going to do it, you might as well say it from the beginning. Look, I think – I didn't ever do it, okay? I wouldn't do it. That's neither here nor there, whether it's a good idea or a bad idea. But the bar around the country has forever said, come on, let's let jurors ask questions so we know what's on their mind. So that will help us be better advocates for our clients. So if a judge in his or her discretion decides to allow some questions in a neutral way and nothing that's asked or answered prejudices your client, then what possible reversible error has been committed? Because on the one hand, it starts the jurors in a frame of mind that they are, again, advocates for the truth. Well, that's not a bad idea. You know, I mean, there are some of us who actually seriously believe that the purpose of a trial is truth-seeking. And so if jurors get it in their heads that that's their job, that's not too bad, is it? Your Honor, I agree that the goal of a trial is to get at the truth. But there are two systems, primary systems in the world in terms of how we decide to get at the truth. There's the inquisitorial system in which the judge asks a lot of questions. The judges go out and solicit evidence, and they say, well, I don't think the prosecutor is doing a good job, and I would ask this, and I would go out and find this. And then the jury, the judge retires with the jury, just like they do in France. That may not be a bad idea, you know, but that's not the system that we have. That's the problem. There are many legal scholars that would do away with the adversarial system of justice altogether, this gladiator thing. You know, and frankly, I haven't really come down to it. Here I've been, you know, an advocate for 20 years, and sometimes, you know, I could say it doesn't always work. You know, you've got, you know, it's not equal, it doesn't always work, and that may be a good idea. But the problem is we do have this system here. And what if the jurors ask the questions? Yes, there are intelligent questions. The question that was asked in this case was a very, very good question. But neither party was prepared for it because the witness's testimony was not consistent with the statement that he gave. And what are we going to do, stop the trial and everybody run out and try to answer the jurors' questions? That's not possible. That's not the way we do things. And in this particular case, it did prejudice the defendant because he's the one that has to make a big deal out of it. And, therefore, it's the court needs to set out a decision that is much more comprehensive than the two decisions that we have in the Ninth Circuit. That's the Gonzales case, so there's a one line, and the other case is Huebner, which cites Callahan. And so we need to clarify, and particularly for the courts, because it is becoming more and more popular. But, you know, because people are worried about juries, you know, wanting to come to court at all and answering the jury's subpoena and being bored. You know, is it the difference is letting them participate in this particular manner or getting them cappuccino machines? I mean, I don't know what the answer is right now, but it seems that it's dangerous to go down this road, and this court does need to clarify it. And in this particular case, it was dangerous. It was solicited by the court ahead of time, and I think that Dr. Roberts is clearly entitled to a new trial. And I see her running out of time. Are you going to give us your position on restitution? Yes. Well, I think the restitution issue is quite simple. The parties agreed, based upon the probation report, that the actual loss was 40, what is it? Forgive me if I misquote my own. It's 43-something thousand dollars, and everybody agreed that that was the actual loss. There wasn't any dispute to that in terms of how that was just agreed on. And then the restitution laws clearly say that restitution can only be imposed for actual loss. I think the answer is simple. If that's what everybody agreed that the figure was, that's what restitution has to be. The law is clear, the statute is clear, and the figure is clear. I have four minutes left. I'd like to use the remaining time for rebuttal. Thank you. Shirley. Mr. Behnke. Good morning, Your Honors. May it please the Court, Jerry Behnke for the United States. First, on the issue that counsel raises regarding the appropriateness of the trial court in this case, or telling the jurors, actually, that they could propose questions if they so chose. In this particular case, there was no reversible error. There is no federal court that has addressed this issue that has yet issued a decision that appellant is asking this court to make, which is essentially instructing trial courts that questions from jurors is a prohibited practice, that it is essentially per se prejudicial. That is simply not the law. The case law is clear that as long as the method of questioning is neutral and the defendant is not prejudiced by the question or the answer, that there is no reversible error. In this case, the procedure adopted by the trial court was virtually identical to the procedure that this court has already approved in Huebner. The question itself and the answer that was offered to the first question were not prejudicial to the defendant, so there is no error. On the issue of whether or not there was jury misconduct in this case, the government disagrees with appellant's view of the Grottemeyer case. The government believes that Grottemeyer supports the government's position in this case in asserting its position that the comment by the juror is not extrinsic evidence. As in Grottemeyer, the juror was simply drawing on the juror's prior life experience in interpreting the evidence, interpreting arguments that were being put forth through questioning of witnesses. In Grottemeyer, there was no evidence introduced whatsoever as to the defendant's mental condition or what effect that mental condition would have had on the offense. But the juror, during deliberations, drew on her prior medical expertise, her prior medical experience, and told the other jurors that the defendant was mentally impaired. And not only was the defendant mentally impaired,  this court held in Grottemeyer that that was not extrinsic evidence because the juror was drawing on her prior life experience in making the comments during deliberations. The same thing occurred in this case. In response to apparent argument or positions that the defense asserted in questioning one of the government's experts, during deliberations, the juror said that there were no weigh stations in the Midwest because the juror had grown up there and knew that to be the case. It was a prior life experience, so it's not extrinsic evidence, and the inquiry ends. If we go beyond that, however, and if the court were to find that it does constitute extrinsic evidence, then the question becomes whether or not that extrinsic evidence affected the outcome of the case. And as Your Honors have pointed out, in this particular case, even if the comments are deemed to be extrinsic evidence, it had no effect on the outcome because the evidence of the source of the pigs, which is what that comment went to, was overwhelming. The truck drivers testified about where the pigs came from. Charles Varnes testified about selling the pigs to Eddie Smotherman. And Johnny DeJong testified about receiving the shipments of pigs with the health certificates in question. So the fact that the pigs with these health certificates traveled from Texas and Illinois to California was overwhelming. So the jurors' comments about weigh stations. Was there any testimony about whether at weigh stations they were interested in the health certificates of the pigs that were on board? No, Your Honor. The only evidence that was introduced at trial was that health certificates were inspected at agricultural inspection stations here in California. There was no evidence at all about what, if anything, would have occurred at weigh stations in Illinois. And on that point, it may very well be that the jurors' comment completely misses the point in that there was no evidence that if there were weigh stations, the certificates would actually have been inspected at the weigh stations. On the issue of sufficiency of the evidence, the government also believes that the case cited in its Rule 28J letter supports the government's position. That was the Cordova-Barajas case. In that particular case, the defendant was charged with knowingly aiding and abetting the cultivation of marijuana when the defendant was found at the site of a marijuana grow. In that case, the defendant testified on his own behalf and offered an implausible story about how he came to be at the marijuana grow and what he was doing there. And this court said that one of the factors that the jury can consider and that this court can consider in assessing whether there is sufficient evidence is the defendant's implausible testimony, if such implausible testimony is offered. And that's exactly what we have in this case. The defendant did offer testimony on his own behalf in his own defense. That testimony was completely implausible when you compare the testimony to the actual documentary evidence. Given his implausible testimony about what he claims that he did in this case, when you put that together with the other evidence that the government introduced about the source of the pigs, the information contained in the health certificates, excuse me, and the testimony from particularly Mr. Naberhaus, there is sufficient evidence to sustain this verdict. Unless the court has any additional questions. Yeah, I do. I'm having a little difficulty with the understanding of the restitution order. If I got the sequence correct, the district court first considered the offense level and adopted the product substitution theory, which is a theory of consequential damages, and arrived at a figure of loss on that theory of 700 and some odd thousand dollars. Then it comes to restitution, recognizes that the question is different and that restitution does reach only actual damages or damages directly caused by the loss, by the criminal conduct. But then without any elaboration, basically uses the same figure and adds on some. And so my question really is how do we, how can we tell that the district court didn't do what it appears to have done, which is take consequential damages and put them into the restitution amount? First of all, the use of the term consequential damages, the issue isn't necessarily how the district court characterized the damages, but what the damages actually were. When the court engaged in the guideline calculation, the guidelines, the comments to the guidelines under the product substitution doctrine speak of consequential damages. That's the way the district court referred to them. I thought the guideline talked about actual losses, doesn't it? Maybe there are two places where it uses different terms. The semantics of this thing are very confusing because there are cases that say you can't include consequential damages, and I don't know exactly what they had in mind. But there are other cases which seem to indicate you can, and I find it very confusing. Yes, Your Honor. The semantics are confusing because there do seem to be conflicting cases where these terminologies are used. What the issue boils down to on restitution is simply whether the amount that was ordered as restitution does reflect actual loss that was directly caused by the defendant's conduct and that is not too far removed from that conduct. And the test is not simply whether the trial court labeled it as consequential damages or not, but you have to look at the actual figures themselves and determine whether it was actual loss. Well, then, what authority do you have that in a scenario similar to this, a restitution award can include the difference between what the product was worth before contamination and afterwards and replacement cost? The authority on this point comes from primarily two sources. The first is the Grumman case, and in the Grumman case, this Court upheld imposing as restitution the amount of lost profits that was suffered by Grumman when Grumman had to destroy its entire inventory. This is Rice, right? Is that the Rice? Yes, I believe so. Sure, but it did not then allow replacement cost. Your Honor is correct. Okay. So what authority is there for allowing both? By analogy, I believe you can also look to the, I believe it was the Koenig case involving the fraud at the bank. The case I remember well. Yes. In that case, what the Court did allow was the amount of cost that the bank suffered in correcting the situation, in reprogramming its computers, notifying customers, handling customer complaints, and by analogy. Sure, but that's only, that's that recovery. I mean, see, what I'm asking is where you have authority for both, the difference between the value of the inventory before and after contamination and replacing the inventory. Plus the consequential damages, which involves destroying the whole herd and I guess fumigating the stockyards and all that kind of thing. Well, the test that this Court has laid out is whether the loss is directly related or results directly from the defendant's conduct. And here, the loss that was suffered by the victim included cleaning up the facility. I believe he was quarantined for a few months. I think whether you can add on the difference between the crop or the pigs as delivered and as represented in the pigs as they actually were in what condition they were delivered in, plus these consequential damages. I think that's what she's asking you. How can you add both? Is that right? That is essentially what I'm asking. And I mean, I guess maybe here's where I, because the district court did not exactly break it out in this way and because it did characterize the replacement of the herd and some other things as consequential. And because it's going to obviously have to go back anyway for Booker reasons, why shouldn't we just simply say, look, it seems unclear to us whether actual, whether the restitution award may include some damages that aren't direct and that aren't allowed, and let it relook at it? I may be mistaken, but I don't believe so, that the district court, when it did impose the restitution, found that the losses were directly caused by the defendant's conduct. Did the government argue for the inclusion of this $40,000 with other consequential damages? Or did the judge, did he do that on his own account? Because the probation people started out with $40,000, right, in this case. That was their calculation, right? Yes, Your Honor. And then it somewhat got escalated, but I was curious as to whether the government was arguing for the inclusion of the $40,000 with the $700-something thousand, or whether the judge decided to do that on his own. No, I don't believe so, Your Honor. I believe that the argument that the government put forth was that the amount of restitution and the amount of loss for guideline purposes should have been the, I believe, $720,000 or $730,000. Now, the other question here is, of course, Smotherman apparently got restitution liability of $106,000, on the theory that he wasn't as well educated as the veterinarian, and therefore he couldn't foresee all these consequential damages. Of course, he was a hog dealer. It seemed to me that he might be able to understand these things better than the veterinarian would, but what's the explanation of that? I believe in Smotherman's case, if I recall correctly, the government was seeking the full $700-some-odd thousand in restitution, and the trial court disagreed on the theory of foreseeability of all of those losses, but I don't believe that the rationale that the trial court used in setting restitution in that case has any bearing on whether the restitution order for Dr. Roberts... Well, do you know what the $106,000... I mean, what was regarded as foreseeable to come up with $106,000? Do you know the answer to that? I don't recall the court's comments on Mr. Smotherman's restitution order, and I don't recall what the calculation was that brought the court to the $106,000 for Mr. Smotherman, but I believe that the $106,000 figure for Smotherman had to do with simply the lost cost of the pigs and did not include cleanup costs and other costs that were associated with the disease, if I recall correctly. The court's reasoning was that the pseudorabies outbreak and the $106,000, so the court did not impose restitution for all of those costs as well. Is there any objection to the $772,000 specifically to various elements in it, or was it just a general objection to that as being disallowed? I mean, was there an argument about this cost or that cost being disallowed as to how the court arrived at the amount? The dispute simply was whether those costs should be included as restitution. I mean, this was just an amount, I guess, that Dijon came up with. I mean, he said it's cost me $772,000, so that was accepted on the basis of his representation. I don't know how it... On this issue, there was testimony at the sentencing hearing, and I believe he also submitted a breakdown of his costs specifically, even including a figure that I think the court excluded from the restitution order, which was trucking costs or something to that effect. But his breakdown of costs that was submitted with the PSR was very specific. He had figures for trucking costs, how much it cost to clean the facility, how much it cost to restock the herd, what the lost value was for the pigs that he had to destroy, and all of that was presented at the sentencing hearing, and there was no argument or dispute about the validity of the claims that he was making about what his costs were. The only dispute was whether those costs are appropriate for restitution. Thank you. It was very clear that the court and all the parties were confused by the determination regarding the length of the sentence under the sentencing guidelines and this product substitution doctrine, which is completely different from the restitution statute, and that is how they arrived at that figure, and it is clearly incorrect. And the actual loss determined by the probation department, everybody agreed with that, but in any event, the restitution order is clearly not valid, and the court does not reverse Dr. Roberts' conviction to pay the restitution order from the scope. What's the language of the guidelines as to the composition of the restitution order? Well, the court, I mean, there was a lot of talk about it. Just to amplify that, isn't there language that to pay restitution amount equal to greater the value of the property on the day of the loss and the value of the property on the day of the sentencing less the value of the property when it's returned or any part of the property is returned? Well, that's a statutory language. How does that apply here, do you know? Well, I think unfortunately that the statute was sort of out of control, and I think that's where the problem came from. And so the restitution order must be vacated, and if it needs to be recalculated, hopefully everyone will have guidance from this court as to exactly how to do that, but it is the restitution order that stands now based on the product substitution doctrine of the guidelines that was used to calculate the length of Dr. McConnell's sentence. And to make it clear, the restitution order should be violated. And that's not correct. Thank you. Okay. Thank you, counsel. Matter just argued will be submitted. And we'll next hear argument in McConnell. Thank you. Thank you.
judges: Goodwin, Cudahy, Rymer